## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MELVIN LAX, individually and on behalf of all others similarly situated,

     Plaintiff,

  v.

PALOMAR MEDICAL TECHNOLOGIES, INC., JOSEPH P. CARUSO, JEANNE COHANE, DAMIAN N. DELL'ANNO, NICHOLAS P. ECONOMOU, JAMES G. MARTIN, A. NEIL PAPPALARDO, LOUIS P. VALENTE, CYNOSURE, INC., and COMMANDER ACQUISITION CORP.,

     Defendants.

Civil Action No.

JURY TRIAL DEMANDED

## <u>COMPLAINT</u>

Plaintiff, Melvin Lax, individually as to Count I and on behalf of himself and the Class (defined below) as to all other counts, by Plaintiff's undersigned attorneys, makes the following allegations on information and belief based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiff and Plaintiff's counsel, which are based on personal knowledge.  The investigation conducted by Plaintiff's counsel included, *inter alia*, a review of relevant public filings made by Palomar Medical Technologies, Inc. ("Palomar" or the "Company") and Cynosure, Inc. ("Cynosure") with the Securities and Exchange Commission ("SEC"), as well as teleconferences, press releases, news articles, analysts' reports, and media reports concerning the Company and the Proposed Transaction (defined below).

## NATURE OF THE ACTION

1.    This is a shareholder case brought individually as to Count I and as a class action for all remaining counts on behalf of all persons, other than Defendants, who own the common stock of Palomar, to enjoin the proposed acquisition of Palomar by Cynosure, as detailed herein.

2.    On March 18, 2013, the Company announced that it had entered into an Agreement and Plan of Merger whereby Cynosure would acquire each outstanding share of Palomar in exchange for $6.825 in cash plus $6.825 worth of Cynosure common stock, in a transaction that valued Palomar at $13.65 per share (approximately $273 million, based on Palomar's outstanding stock as of March 11, 2013) (the "Proposed Transaction").

3.    The Proposed Transaction is the result of a flawed process and a grossly inadequate offer price.  It will deprive Palomar's shareholders of important information regarding the value of their Company shares, and it will also deny them adequate consideration in light of the Company's growth, anticipated operating results, net asset value, and future profitability.  Under these facts and circumstances, the decision of the Company's Board to consider the Proposed Transaction constitutes a breach of the Board member's fiduciary duties.

4.    Moreover, the Director Defendants (as defined below) seek to lock out the Company's shareholders from enjoying the Company's future growth, while at the same time negotiating benefits for themselves by ensuring that they will be part of the new entity moving forward.  For example, Defendant Caruso, Palomar's President and Chief Executive Officer, negotiated his future employment at Cynosure (he is slated to become Vice Chairman of Cynosure's board of directors and its President upon completion of the merger), while at the same time urging the Company's stockholders to vote in favor of the Proposed Transaction.

5.    In pursuing the Proposed Transaction, the Director Defendants (as defined below) have breached their fiduciary duties of loyalty, due care, independence, candor, good faith, and

fair dealing, and they have also aided and abetted such breaches by other Palomar officers and directors.

6. Specifically, as detailed herein, the Board failed to adequately discharge its fiduciary duties to the shareholders by, among other things: (i) failing to ensure they will receive maximum value for their shares; (ii) putting their own personal interests ahead of the interests of shareholders; (iii) failing to conduct an appropriate sales process; and (iv) agreeing to preclusive corporate and deal protections in the Merger Agreement (defined below) with Cynosure that will dissuade or otherwise preclude the emergence of a superior offer. Moreover, Cynosure aided and abetted the Board's breaches of fiduciary duty by, among other things, procuring unreasonable deal protections and convincing the Board to disregard the interests of Palomar's public shareholders.

7. Additionally, the Board failed to disclose material facts in the Proxy, including but not limited to the details of the negotiations surrounding the Proposed Transaction and material information concerning the financial analyses performed by Cynosure's financial advisor and Palomar's financial advisor, that the Palomar shareholders would find important in deciding how to vote on the Proposed Transaction.

8. The Proposed Transaction and the acts of Defendants, as more particularly alleged herein, constitute a breach of Defendants' fiduciary duties to Plaintiff and the Class, as well as a violation of applicable legal standards governing Defendants herein. As a result, Plaintiff alleges that he, along with all other public shareholders of Palomar common stock, is entitled to enjoin the Proposed Transaction unless and until Defendants remedy their breaches of fiduciary duty.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Palomar maintains its headquarters in this district and many of the acts and practices complained of herein occurred in substantial part in this judicial district.

11.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

*Plaintiff*

12.     Melvin Lax is, and at all times relevant hereto has been, a stockholder of Palomar. Mr. Lacks currently owns 6,000 shares of Palomar common stock.

13.     Mr. Lax is a resident of the State of New York.

*Defendants*

## The Company

14.     Palomar together with its subsidiaries, designs, manufactures, markets, and sells lasers and other light-based products, and related disposable items and accessories, for use in dermatology and cosmetic procedures. It operates in two segments, Professional Product and Consumer Product. The Company offers a range of products for skin rejuvenation; skin tightening; wrinkle reduction; acne treatment; fat reduction; body sculpting; soft tissue coagulation; removal of pigmented lesions, such as sun and age spots, freckles, and melasma;

removal of hair, leg veins, and tattoos; removal of vascular lesions, including spider veins, cherry angiomas, and rosacea; and removal of scars, such as acne scars, stretch marks, and warts. Its products include EsteLux pulsed light system, Palomar MediLux pulsed light system, StarLux 300 and StarLux 500 pulsed light and laser systems, Aspire body sculpting system and SlimLipo handpiece, Palomar Icon aesthetic system, Acleara acne clearing system, Adivive fat transfer system and fat processing units, and SkinTel melanin reader. The company also provides Artisan Platform, a facial rejuvenation system; Palomar Emerge fractional laser for skin resurfacing; Vectus laser for hair removal; and Palo Via skin renewing laser. The company sells its products through a network of distributors, cable television shopping, high end department stores, online retailers, physicians' offices, and spas, as well as directly through its Website in North America, the Middle East, Australia, Japan, Asia/Pacific Rim, South and Central America, and Europe.

15.     Palomar maintains its headquarters at 15 Network Drive, Burlington, Massachusetts 01803, and is a Delaware incorporated company.

**Director Defendants**

16.     Defendant Joseph Caruso ("Caruso") has served as a director of the Company since October 23, 2001, and as Chairman of the board of directors since March 9, 2012.  Mr. Caruso has also served as the Chief Executive Officer of Palomar since May 15, 2002, and its President since May 2000.  Prior to that Mr. Caruso served as Palomar's Chief Operating Officer from May 2001 through May 2002 and Vice President and Chief Financial Officer from 1992 to May 15, 2002. Mr. Caruso is responsible for all aspects of operational controls for Palomar.

17.     Defendant Jeanne Cohane ("Cohane") has served as a director of the Company since June 2000.

18.     Defendant Damian N. Dell'Anno ("Dell'Anno") has served as a director of the Company since March 13, 2012.

19.     Defendant Nicholas P. Economou, Ph.D. ("Economou") has served a director of the Company since November 13, 1997.

20.     Defendant James G. Martin, Ph.D. ("Martin") has served as a director of the Company since June 2, 1997.

21.     Defendant A. Neil Pappalardo ("Pappalardo") has served as a director of the Company since June 2, 1997.

22.     Defendant Louis P. Valente ("Valente") has served as a director of the Company since February 1, 1997.  Mr. Valente also served as Executive Chairman from May 2002 until March 9, 2012.  On March 9, 2012, Mr. Valente entered into a Senior Strategic Advisor Agreement with the Company under which he is expected to provide the Company strategic advisory services in various areas, including mergers and acquisitions, new business development and other strategic initiatives.

23.     Defendants Caruso, Cohane, Dell'Anno, Economou, Martin, Pappalardo, and Valente (collectively the "Director Defendants"), are in a fiduciary relationship with the Company, Plaintiff and the public stockholders of Palomar.  Accordingly, the Director Defendants owe fiduciary duties, including good faith, loyalty, fair dealing, due care, and candor, to the Company and its shareholders.

24.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.

25.     Each Director Defendant herein is sued individually as a conspirator and aider and abettor, as well as in his capacity as an officer and/or director of the Company, and the liability of each arises from the fact that each has engaged in all or part of the unlawful acts, plans, schemes, or transactions of which Plaintiff complains herein.

**Cynosure**

26.     Cynosure maintains its principal offices at 5 Carlisle Road, Westford, Massachusetts 01886. Cynosure is a corporation organized and existing under the laws of the State of Delaware.

27.     Cynosure develops, manufactures, and markets aesthetic treatment systems primarily to the dermatology, plastic surgery, and general medical markets. Cynosure develops and markets aesthetic treatment systems that are used by physicians and other practitioners to perform non-invasive and minimally invasive procedures to remove hair, treat vascular and benign pigmented lesions, treat multi-colored tattoos, rejuvenate the skin, liquefy and remove unwanted body fat through laser lipolysis, reduce cellulite and treat onychomycosis. Cynosure is also developing an aesthetic treatment product for the home use market and sells its products through a direct sales force in North America, France, Spain, the United Kingdom, Germany, Korea, China, Japan and Mexico and through international distributors in approximately 100 other countries. Cynosure was founded in 1991 and is headquartered in Westford, Massachusetts. Cynosure's common stock currently trades on the NASDAQ under the symbol "CYNO."

28.     Defendant Cynosure plans to effectuate the Proposed Transaction using Commander Acquisition Corp. ("Merger Sub"), a Delaware corporation and wholly-owned subsidiary of Cynosure. The term "Cynosure" as used herein refers to both of these entities.

29.     The Director Defendants, together with Palomar and Cynosure, are sometimes collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action individually and as a class action on behalf of all shareholders of Defendant Palomar (except Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants) or their successors in interest, who have been or will be adversely affected by the conduct of Defendants alleged herein (the "Class").

31.     This action is properly maintainable as a class action for the following reasons:

a.     The Class of shareholders for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable.  As of May 3, 2013, there were 19,977,989 shares of Palomar stock outstanding, owned by thousands of shareholders of record scattered throughout the United States.

b.     There are questions of law and fact which are common to members of the Class and which predominate over any questions affecting any individual members.   The common questions include, *inter alia*, the following:

i.     whether one or more of the Defendants has engaged in a plan and scheme to enrich themselves at the expense of Palomar's public stockholders;

ii.     whether the Director Defendants have breached their fiduciary duties owed by them to Plaintiff and members of the Class, and/or have aided and abetted in such breach, by virtue of their participation and/or acquiescence and by their other conduct complained of herein;

iii.     whether Defendants have failed to fully inform the Company's shareholders as to the true value of Palomar's assets and earning power and the future financial benefits which Cynosure will obtain from the acquisition;

iv.     whether the Director Defendants have wrongfully failed and refused to seek a purchase of Palomar at the highest possible price and, instead, have sought to chill potential offers and allow the valuable assets of Palomar to be acquired by Cynosure at an unfair and inadequate price;

v.     whether Plaintiff and the other members of the Class will be irreparably damaged by the transactions complained of herein; and

vi.     whether Defendants have breached or aided and abetted the breaches of the fiduciary and other common law duties owed by them to Plaintiff and the other members of the Class.

32.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of the other members of the Class and Plaintiff has the same interest as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

33.     Plaintiff anticipates that there will not be any difficulty in the management of this litigation.

34.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## FACTUAL BACKGROUND

### *Background*

35.     Palomar pioneered the optical hair removal field and has since become a global leader, researcher, and developer of aesthetic light-based systems for hair removal and other cosmetic procedures, including both lasers and high powered lamps. The cosmetic procedures performed utilizing the Company's range of products include: hair removal; body sculpting,

including laser-assisted liposuction; removal of vascular lesions, such as rosacea, spider veins, port wine stains and hemangiomas; wrinkle reduction; removal of leg veins; removal of benign pigmented lesions, such as age and sun spots, freckles and melasma; tattoo removal; acne treatment; skin resurfacing, pseudotolliculitis barbae (PFB) treatment; treatment of red pigmentation in hypertrophic and keloid scars; treatment of verrucae, skin tags and seborrheic keratosis; skin tightening through soft tissue coagulation; and laser treatment for scars, including acne scars, stretch marks and warts, soft tissue coagulation and other skin treatments.

36.     In 1997 Palomar received the first United States Food and Drug Administration ("FDA") clearance for high-powered laser hair removal and has since gone on to build a reputation as an innovator and leader in its industry.  The Company consistently develops cutting edge, sophisticated systems.  Currently, Palomar has rights to over 40 U.S. patents and over 50 foreign patents.  It has received more than 30 FDA clearances and performed over 50 clinical studies.  A number of leading business journals have acknowledged Palomar, including *Business Week, Fortune Small Business, Boston Business Journal, Business 2.0*, and *the Boston Globe Top One Hundred*.

37.     Many of the major advances in light-based hair removal have been based on Palomar technology. For example:

- In December 2006, Palomar became the first company to receive a 510(k) over-the-counter ("OTC") clearance from the FDA for a new, patented, home-use, light-based hair removal device. OTC clearance allows products to be marketed and sold directly to consumers without prescriptions.

- In April 2008, Palomar received FDA clearance for its SlimLipo laser.

- In September 2008 it received clearance from the FDA for the treatment of scars with the Palomar Luxl540™ Fractional Non-Ablative Laser Handpiece.

- In March 2009, Palomar announced the success of a clinical study showing the benefits of the SlimLipo laser.

- In June 2009, Palomar became the first company to receive a 510(k) OTC clearance from the FDA for a new, patented, home-use, laser device for the treatment of periorbital wrinkles.

38.    In recent years, Palomar's products have continued to improve and grow in popularity, causing its doctor and patient bases to expand.  For example:

- On July 8, 2009, Palomar's fractional lasers for scar treatment were featured on an episode of ABC Television's talk show, "The View."

- In February 2010, Palomar's Luxl540™ Fractional non-ablative laser hand piece received the first clearance by the FDA for the treatment of striae (stretch marks) using a fractional laser.

- On March 17, 2010, Palomar's SlimLipo body sculpting laser was featured on "The Dr. Oz Show."

- On December 9, 2010, Palomar announced that the MaxG™ Optimized Pulsed Light™ (OPL) handpiece became available worldwide for use on the Company's StarLux® 500 and Artisan™ laser and pulsed light aesthetic systems.

- On April 1, 2011, the Company announced the release of its revolutionary Palomar Icon™ Laser and Optimized Light System.

- On June 10, 2011, the Company announced the availability of the Adivive™ Fat Transfer System.

- In November 2011, Palomar began selling the Palomar Icon ™ Laser and Optimized Light Aesthetic System in Canada. At the same time, Palomar opened a service depot in London, Ontario to better serve Canadian customers and further grow its Canadian market presence.

39.    To date, Palomar has shipped over 8,000 systems, which have been utilized for the performance of more than 6 million treatments. Clinical results indicate that Palomar's technology can provide superior consumer benefits compared to currently available consumer products.

***Palomar's Financial Prospects***

40.    Notwithstanding its previous success, Palomar continues to innovate and expand. For example, in April 2012, shortly after announcing the release of the Skintel™ Melanin Reader

(the only FDA-cleared melanin reader for use with light-based treatments), Palomar announced the launch of the Emerge™ Fractional Laser, which is an FDA cleared, easy-to-use, affordable fractional non-ablative laser. The Emerge laser further broadened Palomar's doctor and patient base by enabling new and growing aesthetic practices to easily offer laser skin rejuvenation procedures. Then, in June 2012, Palomar expanded its professional product line with "Vectus" (the most powerful diode-based laser system of its kind). Thereafter, on September 6, 2012, the Company announced the launch of the Palomar Vectus Laser. The press release touted the Palomar Vectus Laser as "absolutely superior to all other existing technologies," and included statements from Defendant Caruso, who noted as follows:

> No one knows more about light-based hair removal than Palomar.

*          *          *

> From receiving the first United States Food and Drug Administration clearance for high-powered laser hair removal in 1997, through this launch of the Palomar Vectus Laser, Palomar has demonstrated a unique capability for continually delivering advancements in this must-offer cosmetic application.

41.     In addition to successful product innovation, Palomar also continues to grow financially.

42.     On October 25, 2012, the Company issued a press release announcing its financial results for the quarter ended September 30, 2012, highlighting Palomar's impressive growth. Specifically, the Company reported total revenues of $13.0 million, which represented a 25% improvement from the previous quarter. Defendant Caruso commented on these results, in pertinent part, as follows:

> We are very pleased with the continued growth of our professional business as we expand our product portfolio and make key investments in our distribution network. This quarter was the twelfth consecutive quarter of product revenue growth year over year. Our professional aesthetic products business growth is according to plan as we continue to move toward profitability. We are upgrading our existing customers with our premium flagship platform, the

Palomar Icon™ Aesthetic System, as well as opening new doors and expanding our installed base. The Icon platform is the next generation of aesthetic system with melanin detection technology, high peak powers, state of the art cooling, built-in calibration, and an intuitive user interface to provide fast treatments with excellent outcomes and superior user experience ... The investments we made in the Vectus ™ diode laser hair removal system are paying off.  We are seeing a great market response for the Vectus laser . . . Early acceptance and reviews well exceeded our expectations and the feedback from luminaries is very positive.

*          *          *

Aesthetic light based consumer devices remain a big opportunity. We have developed proprietary technology that positions us well to participate in this emerging market . . .

*          *          *

Now that we have a clinically tested and proven technology, we will seek to align ourselves with a worldwide consumer based distribution partner. We have engaged an investment banker to assist us in identifying and negotiating an arrangement with a partner that has the network and skills to market and distribute our consumer technology . . .

43.     Subsequently, on February 7, 2013, the Company issued a press release announcing its financial results for its fourth quarter 2012 and fiscal year 2012.  The fourth quarter 2012 year-over-year financial highlights included: (i) net income of $2.2 million or $0.12 per diluted share compared to 2011 net loss of $1.9 million or $0.1 0 per share; (ii) professional product revenues of $17.5 million, up 31 %; (iii) professional product revenues gross margin of 60%; (iv) North America professional product revenues of $10.0 million, up 19%; (v) international professional product revenues of$7.5 million, up 49%; and (vi) and cash and investments portfolio of $99.7 million.  The Company's 2012 year-over-year financial highlights included: (i) professional product revenues of $55.4 million, up 25%; (ii) professional product revenues gross margin of60%; (iii) North America professional product revenues of $30.9 million, up 26%; and (iv) international professional product revenues of $24.5 million, up 23%.

The Company further reported that in the fourth quarter of 2012, the Company substantially reduced its consumer marketing expenses.

44.    In connection with the February 7, 2013 press release, Defendant Caruso praised the Company's organic growth and stated that he is:

> . . . very pleased with the continued growth of our professional business as we continue to expand our product portfolio and make key investments in our distribution network.
>
> *              *              *
>
> The efforts that we have made over the past year to transition our consumer business and focus on our core professional market have resulted in bottom line results and top line revenue growth. This quarter was the thirteenth consecutive quarter of product revenue growth year over year. The Palomar Icon™ Aesthetic System is opening new doors and expanding our installed base. The Icon platform is the next generation of aesthetic system with melanin detection technology, high peak powers, state of the art cooling, built-in calibration, and an intuitive user interface to provide fast treatments with excellent outcomes and superior user experience.
>
> *              *              *
>
> The technology investments we made in diode laser technology are paying off as well. We are seeing a great market response for the Vectus hair removal laser. It is the fastest laser hair removal system on the market today with the ability to provide permanent results and treat large body areas quickly and small body areas with precision. The Vectus opens the stand-alone laser hair removal market for us and should be incremental to our platform system sales ... Sales of Vectus systems have exceeded our expectations ... We continue to ramp up production to meet demand. The Vectus is cleared in the United States and most countries in Europe and the Middle East, and was just cleared last month in Canada. We will be rolling the Vectus out to other areas of the world as we fill our distributor pipeline and obtain product registrations in additional countries in upcoming quarters.
>
> *              *              *
>
> Aesthetic light based consumer devices remain a big opportunity in the future. We have developed proprietary technology that positions us well to participate in this emerging market as it develops. Near term we have focused our attention on our core professional business and profitability and we are taking advantage of the technology developed for the consumer market in the strategies that will grow the professional market today. Our consumer fractional laser technology

has delivered the clinical benefits promised, proven to be easy to use and can be manufactured reliably. We have used our experience to develop the Palomar Emerge™ fractional laser that will enable us to expand our customer base at an attractive price point to first time users as part of a long term strategy to develop a new segment of the market.

*          *          *

We believe we have made the right investments that position us to expand the professional aesthetic market with new and unique products. These investments should provide tor future growth and profitability and continued success.

45.     Along with strong financials the Company has a broad patent portfolio consisting of over 40 patents.  As the noted in the Company's most recent Form 10-K, filed with the SEC on March 13, 2013:

We are presently the exclusive licensee and the non-exclusive licensee of several United States patents as well as corresponding foreign patents and pending applications owned by MOH, and we are the joint owner with MOH and, in some cases, the exclusive licensee, of other United States patents as well as corresponding United States pending applications and foreign patents and pending applications. In addition, we are the sole owner of over twenty-five United States patents as well as many corresponding and non-corresponding United States pending applications and foreign patents and pending applications. We also have rights to other patents under exclusive and non-exclusive licenses.

46.     This large portfolio of highly lucrative patents was even noted by Michael Davin ("Davin"), Cynosure's President and CEO, who commented that:

"We believe the acquisition of Palomar creates a substantial opportunity to generate profitable, long-term growth ... [c]ombining with Palomar complements our product portfolio and customer base, adding new product and service revenues, strengthening our global distribution network, creating new cross-selling opportunities and enhancing our intellectual property position with the addition of more than 40 patents. Palomar products such as the Icon and Starlux Laser and Intense Pulsed Light (IPL) Platforms and the recently introduced Vectus Diode Laser for permanent hair reduction have established Palomar's reputation for excellence around the world. This commitment is also reflected in proprietary technology that enables physicians to ensure patient safety and comfort through advances in intelligent energy delivery, skin cooling, and temperature control."

***The Purchase Price Does not Adequately Reflect the Company's Value***

47.    The value of Palomar's stock is greater than the consideration offered in the Proposed Transaction, particularly when considering the Company's organic growth prospects and objectives.  This is particularly evident when considering that Palomar has over $88 million in cash on hand to continue to build as a stand-alone entity.

48.    Indeed, just a few days prior to the announcement of the Proposed Transaction, the Company's stock reached its 52-week high and was trading at over $12.80 per share, representing a steady increase in value since early 2013.

49.    Moreover, analysts have a favorable outlook on Palomar's growth prospects and have conveyed these views to shareholders and the market.

50.    Commenting on the Company's strong market position, profitability and growth prospects, on February 7, 2013, William A. Plovanic at Canaccord Genuity ("Canaccord"), stated:

> We maintain our BUY rating on Palomar Medical following strong Q4/12 results. Top and bottom line were driven by strength in its professional market segment. We view the earnings results positively as they demonstrate the company's ability to generate profits and reinforce our view that management made the right decision to de-emphasize the consumer market and return full attention to the professional market.  US and OUS product sales were both up Y/Y, driven by several new product cycles and strength in its direct international sales offices.

51.    That same day, Canaccord, which also served as Palomar's financial advisor, raised the Company's price targets to $14.50 from $13.50, nearly a dollar more than the proposed Merger Consideration.  On March 18, 2013, however, the date the Proposed Transaction was announced, Canaccord cancelled their price target and determined that they did not expect any subsequent bids for the Company to materialize and that the Proposed Transaction would be completed in the estimated timeframe announced.

52.     Ironically, Canaccord also rendered a fairness opinion as to the Proposed Transaction and regarding the fairness of the $13.65 per share price for Palomar common stock, even though it was substantially lower than the price target set by its own retail price analyst.

53.     Similarly, on February 7, 2013, analyst Anthony Vendetti of Maxim Group, stated:

> We recommend that investors buy PMTI following the better-than-expected 4Q 12 results. In our opinion, the company is making the correct strategic decisions to reaccelerate growth and reduce costs. Professional product revenue grew 8.6% y/y, and operating margin swung to 12.8%, from (4.4%) in 4Q 11, on the back of managing operating expenses. Additionally, PMTI is continuing to seek a worldwide consumer distribution partner for its home-based unit. We believe that recent product launches, including the Vectus, Icon, and Emerge should drive revenue growth for PMTI in 2013.

54.     During the February 7, 2013 earnings call to discuss the fourth quarter 2012 and year-end December 31, 2012 results, Defendant Caruso highlighted the factors that have facilitated the Company's recent success and the reasons for anticipating substantial future organic growth:

> The changes we made in our business over the past year are beginning to positively affect our financial performance. We were very pleased to announce this morning our first profit since the recession began in 2009, excluding, of course, the patent infringement settlement in the third quarter of 2011. This is a major accomplishment and a significant milestone as we look forward to building our business in the future.
>
> *          *          *
>
> During the past few years, we have made major investments in new technology and enhanced distribution. It is always difficult to make major investments during a poor economic period, but these investments have positioned us well for growth as the economy continues to recover.
>
> *          *          *
>
> Over the past few years in particular, we have made significant investments in semiconductor diode laser packaging. This investment coincides with the many advances made in recent years in diode laser technology driven by industrial applications that are unrelated to the aesthetic market. .. Using these improved

diodes in our innovative diode packaging means we can provide significantly smaller, more powerful, more cost-effective, more reliable and more profitable systems for us and our customers. This is a major competitive advantage ... We believe we have the most advanced diode laser packaging and manufacturing capability in the aesthetic industry and the ability to leverage this capability to other important applications.

*          *          *

Laser hair removal is the largest segment of the aesthetic market with tens of thousands of systems installed worldwide. The Vectus is the biggest advance in laser hair removal technology in years, and offers a more profitable proposition. It combines speed, reliability, low cost of ownership, portability and accuracy in one system. The feedback from the systems already sold is extraordinary and we believe the Vectus could be our bestselling product long term.

*          *          *

The Vectus was a significant contributor to our 31% growth in product revenue as compared to the same quarter last year for the professional segment. The overall trend in our professional business is very positive with signs of improvement on every front including cash generated from operations and, of course, profitability. We have been successful in our geographic diversification as well as launching new product offerings . . . We are expanding our product portfolio with high value premium priced platform offerings as well as low entry cost products with recurring revenue components. We have added products to our portfolio that reach segments of the market that we have not addressed in the past. Our goal is to expand our customer base with some of these low-priced entry level systems and upsell these sites at a later time with our broad product portfolio.

*          *          *

This quarter was the 13th consecutive period of product sales growth year-over-year. Our international expansion initiative is moving according to plan . . . Our international business grew substantially in Q4 and we are now looking at other areas around the world to establish additional direct offices.

55.     In sum, Palomar is an established company with a lot of growth potential. Moreover, the Company is poised to continue to accelerate growth in the near future due to its portfolio of patents and an ever growing list of innovative technologies.

56.     Thus, the Proposed Transaction will deprive Plaintiffs of the ensuing financial benefits and Palomar shareholders will be relieved of their equity in the Company for an unfair

price that fails to adequately reflect the true value of the Company. Considering the positive outlook and attributes of Palomar's business model, the 23% premium offered in the Proposed Transaction is clearly inadequate.

### The Proposed Transaction

57.     On March 18, 2013, Palomar and Cynosure publicly disclosed the Proposed Transaction and announced that they entered into the Agreement and Plan of Merger, dated March 17, 2013 ("Merger Agreement"), pursuant to which the Company's shareholders will receive $13.65 per share of Palomar common stock:  $6.825 per share in cash and $6.825 per share in Cynosure common stock.  As part of the Proposed Transaction Cynosure is expected to issue approximately 5.2 million shares (bringing its total shares outstanding to approximately 21.5 million post closing) and fund the approximately $147 million in cash consideration through existing cash balances.  The Proposed Transaction is subject to a 20% collar provision on the number of shares issued to Palomar shareholders based on a negotiated price of $28.38 for Cynosure stock.  The combined company would have approximately $87M in cash and no debt on a pro forma basis for the transaction as of December 31, 2012.  Upon completion of the Proposed Transaction, Cynosure shareholders will own about 77% and Palomar shareholders will own approximately 23% of the combined company.  The Proposed Transaction is expected to be consummated in the third quarter of 2013.

### The Flawed Sales Process and Inadequate Disclosures

58.     To date, Defendants have failed to provide the Company's shareholders with complete and accurate information about the Proposed Transaction.  As set forth in more detail below, the Proxy omits and/or misrepresents material information concerning the flawed sales process for the Company.

59.     Specifically, the Proxy states that the Board "from time to time" in recent years had several strategic reviews and considered the possibility of potential mergers and acquisitions involving other companies within the energy-based aesthetic industry.  Moreover, beginning in 2008 and continuing throughout 2009, Palomar and Cynosure engaged in "several discussions" concerning the possibility of a strategic transaction.  The described "discussions" took place between Palomar and the very suitor that ultimately became the Company's acquiror, yet the Proxy discloses nothing about those discussions other than the fact that they took place. Defendants are required to disclose that information to shareholders and shareholders should be given information concerning those discussions.

60.     The Proxy also fails to disclose who participated in the discussions, whether terms including, but not limited to, price were exchanged during these discussions (and, if so, what they were), or even the number of times that Palomar and Cynosure convened to discuss a potential combination.  The Proxy states that following the discussions between Cynosure and Palomar that transpired throughout 2009, the discussions were abandoned because they "were unable to agree on a basis on which to proceed." The Proxy is silent, however, as to what the parties discussed and, more importantly, the reason(s) why the discussions or negotiations ended.

61.     According to the Proxy, in September 2007, Defendant Caruso and Michael R. Davin, the CEO and Chairman of the Board of Cynosure, discussed a potential combination. That same month, on September 15, 2007, Caruso and a representative of a third-party medical device company, identified in the Proxy only as "Company A", discussed a potential merger. The Proxy offers shareholders no further information on this issue.  Specifically, the Proxy fails to disclose the identity of Company A, the identity of the representative at Company A who spoke with Defendant Caruso, who approached whom at the meeting, whether Company A was a

strategic buyer with synergistic values or a financial buyer, what information (if any) Company A was provided by Palomar, or whether Company A was given access to the same information as Cynosure.

62.     The next day, and twice in October 2007 Caruso and Davin met to discuss the potential benefits of a combination.  While the Proxy gives notice of the meetings it does not state which of the parties proposed these meetings and initiated the discussions of a possible strategic transaction. Further, the Proxy does not disclose any potential advantages of a combination that were discussed at that time.

63.     The Proxy further notes that discussions continued between Palomar and Cynosure and Company A over the next few months and on January 6, 2012, Davin called Caruso and informed him that Cynosure was no longer interested in pursuing a potential combination at that time. The reasons underlying Cynosure's decision, however, are omitted.

64.     The Proxy goes on to indicate that on May 7, 2012, Caruso and Weiner met with representatives of a global skin health company, identified in the Proxy as "Company B", and discussed a potential combination.  The Proxy offers shareholders no further information on this matter.  Specifically, the Proxy does not disclose the identity of Company B, the identity of the representatives of Company B who spoke with Caruso and Weiner, whether Company B was a strategic buyer with synergistic values or a financial buyer, what information (if any) Company B was provided by Palomar, or whether it was given access to the same information as Cynosure.

65.     According to the Proxy, on June 25, 2012, Palomar received a stock-for-stock acquisition proposal from Company B. Yet again, the Company fails to disclose the material terms of Company B's proposal (*e.g.*, the value per share indication), how the proposal was communicated, who communicated the proposal, and who at Palomar received the proposal.

66.     On July 17, 2012, Palomar's M&A Committee of the Board ("M&A Committee") reviewed the proposal and determined that the proposal was too low to warrant further consideration.

67.     Shareholders continue to be kept in the dark regarding what the value per share offered was, what the M&A Committee considered in determining that the proposal was too low, and the reasons for its determination.

68.     According to the Proxy, on September 6, 2012, Davin met with Caruso and discussed a potential combination of Cynosure and Palomar.

69.     On November 5, 2012, Leerink Swann ("Leerink"), Cynosure's financial advisor, met with Canaccord, Cynosure and Palomar representatives to conduct due diligence meetings. However, the Proxy fails to mention whether information, forecasts or targets were exchanged between the parties and, if there was an exchange of information, fails to outline when the supplied information, forecasts or targets were prepared and whether the information, forecasts or targets were updated,

70.     On December 4, 2012, the Proxy indicates that at a meeting between Davin and Cynosure's CPO, Timothy W, Baker, and Caruso and Weiner, Cynosure proposed an offer to pay Palomar shareholders $11.00 per share of Palomar common stock consisting of 50% cash and 50% Cynosure common stock.  The terms of the offer contemplated that Caruso would join the Cynosure board as Vice Chairman and would become Cynosure's President of a newly created Emerging Business division.  On January 18, 2013, however, Cynosure decided not to create its Emerging Business division, and in lieu of becoming president of that division, upon consummation of the Proposed Transaction, Caruso was offered Cynosure's presidency.

71.     A week earlier, on January 11, 2013, the Proxy indicates that Cynosure revised its offer to pay Palomar's shareholders $12.35 per share of Palomar common stock consisting of 60% cash and 40% Cynosure common stock.

72.     The Proxy further states that on January 21, 2013, Cynosure slightly increased its offer to pay Palomar's shareholders merger consideration to a value representing at least a 30% premium to Palomar's stock price, consisting of 50% cash and 50% Cynosure common stock. However, the Proxy fails to disclose the value per share offered by Cynosure.

73.     According to the Proxy, on February 5, 2013, Palomar's Board met to discuss Cynosure's proposal. At that meeting, Caruso reported to the Board that renewed negotiations with Company B stalled and that Company B refused to enter into any further diligence activities since Palomar was seeking a "multiple" on its market capitalization.  The Proxy fails to disclose what the market multiple was that Palomar was seeking, and does not disclose the basis for Palomar choosing that multiple.  That same day the Board authorized Palomar's management to continue negotiations with Company A.

74.     The Proxy goes on to report that on February 19, 2013, Company A offered $13.50 per share of Palomar common stock, consisting of approximately 81% cash and approximately 19% Company A common stock.  On March 6, 2013, Cynosure purportedly raised its offer to $13.65 per share of Palomar common stock, consisting of 50% cash and 50% Cynosure common stock, according to the Proxy. Company A the next day confirmed that $13.50 was its best and final offer and on March 13, 2013, Cynosure is alleged to have indicated that $13.65 was its best and final offer.

75.     On March 8, 2013, the M&A Committee met with Caruso, Weiner, representatives from Canaccord and representatives from Wilmer Cutler Pickering Hale & Dorr

LLP ("WilmerHale") and determined that Cynosure's offer was superior to that of Company A's offer, and further discussed the prospective synergies of a transaction with Cynosure; yet the Proxy fails to disclose any details about those synergies, including the value attributed to the discussed prospective synergies.

76.     On March 14, 2013, Cynosure's board of directors is said to have conducted a meeting with Davin, representatives of Leerink and others.  At the meeting, Davin purportedly discussed potential cost-savings that could be achieved in the merger.  The Proxy fails to describe what those cost-savings were and is silent as to the value attributed to those cost-savings.

77.     On March 17, 2013, Cynosure's board of directors asked Leerink to render a fairness opinion on the Proposed Transaction to the Board.  The Proxy fails to disclose why the Board selected Leerink for this engagement, whether other financial advisors were considered, and if so, which ones, and the nature of any services that Leerink had provided to Cynosure or Palomar during the prior two years and the amount of fees received for any such services.  Cynosure's Board thereafter recommended approval of the Proposed Transaction, according to the Proxy.

78.     That same day, the Board of Palomar met with Caruso, Weiner, representatives of WilmerHale and Canaccord to discuss the terms of the merger agreement.  At that meeting, the Board asked Canaccord to render a fairness opinion ("Fairness Opinion") on the Proposed Transaction to the Board.  The Proxy fails to disclose the reasons why the Board selected Cannacord for this engagement, whether any other financial advisors were considered and if so, which ones, and whether Cannacord had provided any services to Cynosure or Palomar during

the prior two years and if so the types of services and the amount of fees received during that period.

79.     The Board thereafter unanimously approved the Proposed Transaction.   That same day, Palomar executed the Merger Agreement with Cynosure and announced the Proposed Transaction to the public the next day.

**The Proxy Fails to Disclose Other Material Information**

80.     As detailed herein, in eliciting support for the Proposed Transaction, the Board failed to disclose all material information necessary to enable Palomar's shareholders to make an informed decision concerning the Proposed Transaction.

81.     In particular, the Proxy fails to disclose material information concerning the financial analyses of Leerink, Cynosure's financial advisor and Canaccord, Palomar's financial advisor, that the Palomar shareholders would find important in deciding how to vote on the Proposed Transaction, including the following:

(a)     With respect to Leerink's Illustrative Discounted Cash Flow (DCF) Analysis of Palomar, the Proxy indicates Leerink calculated indications of net present value using discount rates ranging from 14% to 18%, but the Proxy fails to disclose the specific inputs and assumptions used to determine that range. The DCF Analysis calculated the per share equity value, "which equates to approximately $0.75 per share assuming a 35% tax rate and discounted by the 20-year expected yield-to-maturity of a bond rated AAA Standard & Poors rating service." The Proxy fails to disclose the discount rate of the 20-year expected yield-to-maturity- of a bond rated AAA Standard & Poors rating service used by Leerink.

(b)     With respect to Leerink's DCF Analysis of Cynosure, the Proxy indicates Leerink calculated indications of net present value using discount rates ranging from 11% to 15%.  However, the Proxy fails to disclose the specific inputs and assumptions used to determine that range.

(c)     With respect to Canaccord's Selected Peer Group Analysis of Cynosure, the Proxy fails to state the multiples of: (i) equity value of actual revenues for 2012; (ii) equity value of estimated revenues for 2013; and (iii) multiples of equity value of adjusted estimated EBITDA for 2013. The Proxy also fails to disclose the implied equity value per share ranges for Palomar derived in this analysis.

(d)     With respect to Canaccord's Selected Precedent Transaction Analysis, the Proxy fails to disclose the implied equity value per share ranges for Palomar used in the analysis.

(e)      With respect to Canaccord's DCF Analysis, the Proxy fails to disclose how management's stock-based compensation was calculated into the analysis; specifically (i) whether stock-based compensation was treated as a cash or non-cash expense, which is especially crucial with respect to smaller technology companies (including Palomar) where stock based compensation can account for a large portion of compensation and depending on how it was treated, can significantly affect the resulting values as a cash expense by Canaccord; (ii) how Canaccord accounted for Palomar's net operating loss carry forwards in its DCF Analysis; and (iii) the implied equity value per share ranges for Palomar used in the analysis.

(f)     The Proxy fails to disclose the financial projections for Palomar which were relied upon by Leerink and Canaccord in their analyses, for calendar years 2013,

2014 through 2015 (as used by Canaccord) and March 1,2013 through December 31, 2018 (as used by Leerink), including, but not limited to, the following financial information: (i) EBITDA; (ii) stock-based compensation; (iii) working capital; (iv) capital expenditures; (v) net income; (vi) taxes (or tax rate); and (vii) free cash flow.

82.     In addition, when one company purchases another company in a transaction involving a stock-for-stock transfer of stock, the acquiring company's stock becomes the currency of the deal. Thus, any company weighing an offer assessing the fairness of such a deal that includes stock in the consideration should, inherently, perform reverse due diligence on the acquirer. The target company can only assess the fairness of the deal if the acquiring company's stock is properly valued. If, for instance, the stock acquirer's stock is overvalued, the shareholders of the target company will receive less than full value for the shares they are selling. Put another way, because Cynosure's stock may be worth less than what the market reflects - and certainly less than the value reflected when the Board recommended the Proposed Transaction with Cynosure's stock as consideration – Palomar shareholders may not be receiving adequate compensation for their shares, despite the existence of a collar.

83.     The value of Cynosure's stock is important information to Palomar's shareholders. In turn the due diligence performed on Cynosure by the Board (to the extent it was performed at all) is critical information to shareholders of Palomar who, as shareholders, are being asked to accept stock as currency, and are both buyers and sellers for the purposes of due diligence.

84.     Notwithstanding the importance of this information to Palomar shareholders, the Proxy fails to disclose the due diligence performed by Palomar and/or Canaccord on Cynosure (to the extent it was performed at all). Shareholders cannot truly assess the fairness of the Proposed Transaction if they do not know how the currency they are receiving, Cynosure stock,

is valued. Shareholders cannot, absent adequate due diligence, be aware of the valuation of Cynosure stock. If the described due diligence was, in fact, performed, shareholders cannot adequately assess the value of the stock they are acquiring - here, Cynosure - unless they are provided with information regarding what due diligence was performed on Cynosure (if any) and the results of that due diligence.

85.     However, it appears that neither the Company nor its financial advisor, Canaccord, took any steps to evaluate the worth of Cynosure. Specifically, there is nothing in the public record to suggest that the Company or its representatives conducted reverse due diligence of Cynosure or conducted any financial analyses of Cynosure to determine the value of the stock component of the transaction.

86.     Rather, Canaccord assumed in its financial valuations that Cynosure's current trading price adequately reflected its intrinsic value and that, based on this price, shareholders would receive a mix of cash and stock consideration totaling $13.65 per share. However, the stock component of the consideration is subject to a specified exchange ratio and therefore, as Defendants concede in the Proxy, the ultimate value of the deal is subject to the fluctuations of the market price of Cynosure stock.

87.     Notably, a financial valuation conducted by Cynosure's financial advisor Leerink indicates that Cynosure's current share price is overvalued, which if true, would mean that the value of the merger consideration is less than $13.65 per share. Specifically, Leerink conducted a Publicly Traded Companies Analysis that, applying 2013 and 2014 revenue and EBITDA multiples from comparable companies, yielded midpoint values between $16.00 – $22.00 per share, considerably lower than the Company's current share price.

88.     Accordingly, Palomar shareholders are unable to assess the adequacy of the stock consideration to be received in the proposed merger because the Proxy fails to disclose whether the Company and/or Canaccord performed any financial valuations of Cynosure in determining the fairness of the Proposed Transaction.

***The Merger Agreement's Terms and Deal Protections Favor Cynosure***

89.     Compounding the harm associated with undervaluing Palomar's shares, the terms of the Merger Agreement unreasonably favor Cynosure. For example, news articles have highlighted certain synergistic values that would benefit Cynosure. It is unclear, however, if these values were negotiated for, and passed onto shareholders, in the Proposed Transaction.

90.     Moreover, to protect Cynosure's offer for Palomar and to ensure that no competitive industry bidder will step in to reap those benefits, Cynosure negotiated deal protections. Unfortunately Palomar's Board agreed.   Specifically, the Merger Agreement contains preclusive measures, considered collectively and in context, that will dissuade or preclude the emergence of a superior offer.   These deal protection measures unreasonably favor Cynosure.

91.     The Merger Agreement contains a "No Solicitation" provision, which precludes Palomar from: (i) initiating, soliciting, or knowingly encouraging or facilitating inquiries or proposals; (ii) engaging or participating in any negotiations; and (iii) providing any confidential or nonpublic information or data. Palomar may only furnish nonpublic information and participate in negotiations or discussions if the Board concludes in good faith that such Acquisition Proposal (as defined in the Merger Agreement) is likely to result in a Superior Proposal.

92.     In addition, in connection with the Merger Agreement, Palomar was obligated to immediately cease any discussions or negotiations conducted with any party other than Cynosure before the effective date of the Merger Agreement.

93.     Moreover, pursuant to the "No Solicitation" provision, Palomar must notify Cynosure of any inquiries, proposals or offers related to any Acquisition Proposal, or any request for nonpublic information reasonably expected to lead to an Acquisition Proposal, within one business day. In connection with such notification, Palomar must disclose to Cynosure the material terms of any Acquisition Proposal or request for information, including the identity of the party making such Acquisition Proposal, and, if applicable, any written requests, proposals or offers, including the proposed contracts themselves. What is more, Palomar must keep Cynosure promptly apprised of any related developments, discussions and negotiations, including the terms and conditions of any such request, inquiry or Acquisition Proposal or any material changes or developments in the status or terms, on a current basis. Thus, the Merger Agreement unfairly assures that the process will favor Cynosure, as it will have more information than any other party, and no rival bidder is likely to emerge.

94.     Further, the Board may only change its recommendation of the Proposed Transaction ("Change in Recommendation") to pursue another Acquisition Proposal under limited circumstances. For example, the Board can only make a Change in Recommendation if the Company receives an Acquisition Proposal that the Board deems to be a Superior Proposal to the Merger Agreement. In addition, Palomar is precluded from making such a Change in Recommendation unless and until the Company: (a) gives Cynosure at least three business days to respond to any such Acquisition Proposal; and (b) takes into account any amendment or modification to the Merger Agreement proposed by Cynosure. Therefore, under the Merger

Agreement, Cynosure has matching rights that favor itself and effectively discourages any potential competing bids.

95.     Additionally, the Merger Agreement provides that a termination fee of $10.642 million must be paid to Cynosure if the Company determines to pursue a Superior Proposal or if the Board otherwise effects a Change in Recommendation. The amount of the termination fee is wholly disproportional and unreasonable and will serve to deter other bidders from making Superior Proposals.

96.     The Merger Agreement also included a no-shop provision that restricted Palomar's Board from soliciting alternative proposals.

97.     Moreover, instead of looking out for the interests of Palomar's shareholders, the Director Defendants breached their fiduciary duties by favoring their own interests above those of Palomar's shareholders. While Palomar's public shareholders will receive less than their fair share of the combined company, Defendant Caruso secured for himself a lucrative career as Cynosure's President and Vice Chairman of its board.

98.     As it stands, the Proposed Transaction does not adequately value Palomar's shares and the Merger Agreement contains deal protection measures that will preclude the emergence of a superior offer. Instead, as a direct result of the Board's abandonment of its duties, the Proposed Transaction will benefit Cynosure. Accordingly, in the absence of injunctive relief, shareholders will not be able to make an informed decision about whether to vote in favor of the Proposed Transaction.

## COUNT I

### Violations of Section 14(a) of the Exchange Act
### And Rule 19a-9 Promulgated Thereunder
### (Brought Individually)

99.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

100.     Defendants have issued the Registration Statement, which includes the joint proxy statement of Palomar and Cynosure, with the intention of soliciting shareholder support of the Proposed Transaction.

101.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

102.     Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

103.     The Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

104.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II

### Breach of Fiduciary Duties
### (Brought as a Class Action against all Director Defendants)

105.     Plaintiff repeats all previous allegations as if set forth in full herein.

106.     The Director Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care and loyalty owed to the public shareholders of Palomar and have acted to put their personal interests ahead of the interests of Palomar shareholders.

107.     The Director Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize Palomar's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

108.     The Director Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the shareholders of Palomar because, among other reasons:

　　　　(a)     they failed to take steps to maximize the value of Palomar to its public shareholders and took steps to avoid competitive bidding;

　　　　(b)     they failed to properly value Palomar; and

　　　　(c)     they ignored or did not protect against the numerous conflicts of interest resulting from the Director Defendants' own interests in connection with the Proposed Transaction.

109.     As a result of the Director Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Palomar's assets and will be prevented from benefiting from a value-maximizing transaction.

110.     Unless enjoined by this Court, the Director Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

111.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### Aiding and Abetting
### (Brought as a Class Action against Cynosure)

112.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

113.    Defendant Cynosure is sued herein as an aider and abettor of the breaches of fiduciary duties outlined above by the Director Defendants, as members of the Board of Palomar.

114.    The Director Defendants have breached their fiduciary duties in the manner described herein. Such breaches could not and would not have occurred but for the conduct of Defendants Palomar and Cynosure.

115.    Defendants Palomar and Cynosure had knowledge that they were aiding and abetting the Director Defendants' breach of fiduciary duties to Palomar shareholders.

116.    Defendants Palomar and Cynosure rendered substantial assistance to the Director Defendants in the breach of their fiduciary duties to Palomar shareholders.

117.    As a result of these Defendants' conduct of aiding and abetting the Director Defendants' breaches of fiduciary duties, Plaintiffs and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

118.    As a result of the unlawful actions of Defendants, Plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive fair value for Palomar's assets and business and will be prevented from obtaining the real value of their equity ownership in the Company.

119.     Unless the actions of these Defendants are enjoined by the Court, they will
continue to aid and abet the Director Defendants' breach of their fiduciary duties owed to
Plaintiffs and the members of the Class, and will aid and abet a process that inhibits the
maximization of shareholder value.

120.     Plaintiffs and the other members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Declaring this action to be a class action and certifying Plaintiff as the
Class representatives and his counsel as Class counsel;

B.     Declaring that the Registration Statement is materially misleading and
contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule
14a-9 promulgated thereunder;

C.     Declaring that the Proposed Transaction is unfair, unjust, and inequitable
to Plaintiff and the other members of the Class;

D.     Enjoining preliminarily and permanently the Defendants from taking any
steps necessary to accomplish or implement the proposed merger of Defendant Palomar with
Cynosure at a price that is not fair and equitable;

E.     In the event Defendants consummate the Proposed Transaction, rescinding
it and setting aside or awarding rescissory damages to Plaintiff and the Class;

F.     Directing Defendants to account to Plaintiff and the Class for their
damages sustained because of the wrongs complained of herein;

G.     Awarding Plaintiff the costs of this action, including reasonable
attorneys', accountants', and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and
proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiff hereby demands a trial by
jury of all issues so triable.

Dated: May 28, 2013                         Respectfully submitted,

                                            **SHAPIRO HABER & URMY LLP**


                                            By: /s/ Thomas G. Shapiro
                                            Thomas G. Shapiro (BBO# 454680)
                                            tshapiro@shulaw.com
                                            Adam M. Stewart (BBO# 661090)
                                            astewart@shulaw.com
                                            53 State Street
                                            Boston, MA 02109
                                            Telephone: (617) 439-3939
                                            Facsimile: (617) 439-0134

                                            **WOLF HALDENSTEIN ADLER
                                              FREEMAN & HERZ LLP**
                                            Gregory Mark Nespole
                                            nespole@whafh.com
                                            Benjamin Y. Kaufman
                                            kaufman@whafh.com
                                            Martin E. Restituyo
                                            restituyo@whafh.com
                                            270 Madison Avenue
                                            New York, NY. 10016
                                            Telephone: (212) 545-4600
                                            Facsimile:  (212) 545-4653